# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF INDIANA
# EVANSVILLE DIVISION

| | |
|---|---|
| SG EQUIPMENT FINANCE USA CORP., | |
| Plaintiff, | Case No. 3:19-cv-00210-RLY-MPB |
| v. | |
| KIMBALL ELECTRONICS, INC., | |
| Defendant/Third Party Plaintiff, | |
| v. | |
| ARIBA, INC., | |
| Third Party Defendant. | |

## THIRD PARTY PLAINTIFF KIMBALL ELECTRONICS, INC.'S COMPLAINT AGAINST THIRD PARTY DEFENDANT ARIBA, INC.
### (DEMAND FOR JURY TRIAL)

Kimball Electronics, Inc. ("KEI"), by counsel, respectfully states the following for its Third Party Complaint against Ariba, Inc. ("SAP Ariba"):

1. KEI is a leading manufacturer of durable goods electronics serving a variety of industries on a global scale. It employs more than 6,500 workers in facilities around the world. Its primary customers are in the medical, industrial, automotive, and public safety industries.

2. KEI's products are complex. One of KEI's products may be comprised of hundreds of individual parts—including resistors, transistors, and capacitors—that KEI sources from around the world to meet its manufacturing needs. Those individual parts then may be assembled, for example, into a single board:



3. In order to source and procure those individual parts in the timely, cost-effective manner necessary to meet customer needs, KEI's seventy-five buyers employ sophisticated strategies, aided substantially by software designed specifically for that complicated task.

4. On an annual basis, KEI's buyers are responsible for purchasing approximately $750 million worth of parts—acquiring more than 70,000 unique components from a combined 3,000 suppliers around the world.

5. For some time, KEI has relied principally on two software programs to source parts and manage its supply chain: Quote Win and Fusion Ops. Both are add-on tools to the core SAP enterprise resource planning (or ERP) system that KEI uses to transact its materials purchasing, quoting, and supply chain functions.

6. Quote Win allows KEI's buyers to upload complex bills of materials, select in one screen which suppliers are to solicit quotes, and send a request for quote to the selected suppliers. It allows suppliers to access the RFQ, input pricing and component information, and then submit their response to KEI for review. Then, once the supplier information is provided, KEI's team can download a costed bill of material for analysis and action.

7. Fusion Ops provides KEI's buyers a portal in which they manage KEI's purchasing functions. Those functions include purchase requisition management (from one to multiple suppliers), purchase order issuance and management, and determining the hierarchy of purchasing needs.

8. In 2017, KEI was looking to replace Quote Win and Fusion Ops with a single software solution that would make KEI's complex supply chain management more efficient and less costly, including by adding the ability to purchase direct from manufacturers and eliminate middle-man distributors. That desire led KEI into discussions with Ariba, Inc. ("SAP Ariba").

9. As noted above, KEI's products often contain hundreds of component parts. A bill of materials for a single KEI product (the list of subassemblies, and the parts necessary for each, that go into the final product) routinely has multiple levels.

10. Each individual part, in each level, could have multiple potential suppliers. KEI's buyers use Quote Win to communicate with, and obtain quotes from, each potential supplier. KEI's buyers then use Fusion Ops to communicate with its chosen suppliers, to manage the purchase and delivery of parts.

11. Between June and November 2017, KEI demonstrated its existing systems to SAP Ariba personnel, so that SAP Ariba could evaluate KEI's needs, understand KEI's use of Quote Win and Fusion Ops, and propose an effective replacement solution.

12. At multiple meetings throughout 2017, SAP Ariba—led by its Account Executive, Jeremy Harrell, and Director of Solution Consulting, Kerry Persons—represented that SAP Ariba offered cloud service options that would allow KEI's buyers to do what they already were doing through Quote Win and Fusion Ops, but in a far more efficient and cost-effective manner, including by adding the ability to purchase direct from manufacturers and eliminate middle-man distributors.

13. For example, SAP Ariba represented in a June 2017 presentation that it possessed the capability to support multi-level bills of materials of the kind used by KEI. That functionality would be necessary to replace Quote Win.

14. SAP Ariba's Jeremy Harrell also represented on September 27, 2017, that SAP Ariba's cloud services would allow KEI to purchase directly from certain manufacturers, including Texas Instruments. At the time, KEI had to purchase parts from Texas Instruments through a middle-man distributor. SAP Ariba represented that its cloud services would allow KEI to purchase direct from Texas Instruments—because, SAP Ariba said, Texas Instruments also was utilizing SAP Ariba's cloud services. If true, the ability to eliminate the Texas Instruments middle-man distributor would generate significant cost savings for KEI.

15. SAP Ariba also represented that other customers successfully had implemented its services to source "direct" materials (parts that go into products), and not just "indirect" materials (everyday office-use items, such as computers, pencils, notepads, etc.).

16. As KEI learned later, none of these representations was true. In 2017, SAP Ariba's services did not possess the capability to handle multi-level bills of materials. Texas Instruments and other manufacturers did not use SAP Ariba's cloud services in such a way that would allow KEI to purchase directly from them. And KEI was unable to locate other SAP Ariba customers who had managed to implement SAP Ariba services for "direct" purchasing without significant problems arising. In sum, SAP Ariba was wholly unsuited and incapable of providing complex and multi-level

sourcing and procurement services to a manufacturer of durable goods electronics such as KEI.

17. Throughout 2017, SAP Ariba performed multiple "demonstrations" to convince KEI it should purchase SAP Ariba's services. In June 2017, KEI asked SAP Ariba whether it was possible to use KEI's actual data to provide proof of concept that SAP Ariba's services would work as represented. SAP Ariba said no, and that it would provide product demonstrations utilizing only "dummy" data prepared by SAP Ariba. Using that "dummy" data, SAP Ariba's demonstrations appeared to show that its products would be an effective replacement for Quote Win and Fusion Ops.

18. During those 2017 demonstrations, SAP Ariba repeatedly represented to KEI that its cloud services effectively would replace—indeed, expand upon—the functions performed by Quote Win and Fusion Ops. KEI reasonably relied on SAP Ariba's representations concerning the capabilities of SAP Ariba's own services.

19. SAP Ariba understood from its many conversations with KEI personnel that a partial solution would be no solution at all; SAP Ariba would have to provide a total replacement for KEI's use of Quote Win and Fusion Ops. SAP Ariba never qualified its services' ability to provide that total solution—to the contrary, it repeatedly represented that it could provide "end-to-end process management."

20. The discussions between SAP Ariba and KEI ultimately led KEI, on December 1, 2017, to execute an "Order Form for SAP Cloud Services SAP Reference

No. 0220757350" ("Order Form-350") A true and accurate copy of that Order Form, with its Schedules A-E, is attached as **Exhibit 1**.

21. Through Order Form-350, SAP Ariba purported to sell KEI five different "SAP Cloud Service[s]": (1) "SAP ARIBA STRATEGIC SOURCING SUITE"; (2) "SAP ARIBA SUPPLY CHAIN COLLAB FOR BUYERS"; (3) "SAP ARIBA BUYING A INVOICING, PARTNER ED"; (4) "SAP ARIBA SUPPLY CHAIN, FORECAST ADD-ON"; (5) "SAP ARIBA COMMERCE AUTOMATION, PARTNR ED" (together, the "Cloud Services").

22. Nowhere in Order Form-350 did SAP Ariba purport to describe what the Cloud Services are, what they were intended to do, how one might determine whether SAP Ariba had provided the Cloud Services, or how one might determine whether SAP Ariba had breached a promise related to any of the Cloud Services.

23. Schedule E to Order Form-350 sets forth "General Terms and Conditions for SAP Cloud Services" ("General Terms and Conditions"). The General Terms and Conditions include a warranty, entitled "Good Industry Practices," that states in relevant part: "SAP [Ariba] warrants that it will provide the Cloud Service[s]: (a) in substantial conformance with the Documentation."

24. "Documentation" is a defined term in the General Terms and Conditions: "SAP's then-current technical and functional documentation as well as any roles and

responsibilities descriptions, if applicable, for the Cloud Service which is made available to Customer with the Cloud Service."

25. At no time prior to KEI's December 1, 2017 execution of Order Form-350 did SAP Ariba provide KEI with "Documentation," as that term is used in the General Terms and Conditions.

26. Through Order Form-350, SAP Ariba purported to sell KEI consulting services in the form of "SAP ARIBA STRATEGIC SOURCING SUITE SETUP" ("Consulting Services").

27. Nowhere in Order Form-350 did SAP Ariba purport to describe what the Consulting Services include, what they were intended to do, how one might determine whether SAP Ariba had provided the Consulting Services, or how one might determine whether SAP Ariba had breached a promise related to the Consulting Services.

28. Schedule A to Order Form-350 provides "SAP Consulting Services Supplemental Terms and Conditions" ("Consulting Terms"). The Consulting Terms include a warranty, entitled "Consulting Services Warranty," that states in relevant part: "SAP warrants that for ninety (90) days following provision of the Consulting Services the Deliverables will materially conform with the specifications for that Deliverable in accordance with the respective Service Description or Scope Document …."

29. "Deliverables" is a defined term in the Consulting Terms: "those specific work products or tangible results which are explicitly identified as 'Deliverable' under the applicable Order Form." Order Form-350 identified no such "Deliverable."

30. "Service Description" is a defined term in the Consulting Terms: "pre-defined descriptions of services found at http://www.sap.com/corporate-en/about/resources/service-descriptions/index.html in effect as of the Order Form Effective Date." The consulting services document available at that site states, in relevant part, that "SAP will perform Services as further defined in the Scope Document to assist the Licensee with Licensee's Project."

31. "Scope Document" is a defined term in the Consulting Terms: "the document that is provided with and becomes part of the applicable Order Form which further defines the Consulting Services to be provided and other engagement specifics."

32. At no time before KEI's December 1, 2017 execution of Order Form-350 did SAP Ariba provide KEI with a "Scope Document," as that term is used in the Consulting Terms.

33. At no point did SAP Ariba provide any information describing what, exactly, it was promising to provide KEI in conjunction with the Consulting Services.

34. Through Order Form-350, SAP Ariba purported to sell KEI Cloud Services (for a total of $3,841,460) and Consulting Services (for an additional $51,000). But Order

9

Form-350 actually promised nothing. And nothing is exactly what SAP Ariba provided to KEI.

35. Beginning in January 2018, KEI attempted to implement what it thought it had purchased from SAP Ariba—a service that would allow KEI to retire its Quote Win and Fusion Ops systems. By December 2018, SAP Ariba finally confirmed to KEI that SAP Ariba's services would not—indeed, never could have—replaced Quote Win and Fusion Ops.

36. Over the course of 2018, SAP Ariba revealed the following, among other failings: (1) SAP Ariba did not offer a service that could process KEI's multi-level bills of materials; (2) a number of functions performed by Quote Win and Fusion Ops could not be performed by SAP Ariba's services, absent a number of "workarounds" or "future developments" that would have to be designed, tested, and then implemented (if they actually worked); (3) key KEI parts manufacturers, such as Texas Instruments, did not transact business with their customers by using SAP Ariba's network; and (4) KEI did not own, and would have to purchase for an additional $103,684, software necessary to implement even the limited service SAP Ariba claimed it could provide.

37. As these issues (and others) were identified, SAP Ariba continually reassured KEI that each could and would be addressed by the time KEI intended to "go live" with SAP Ariba's services. SAP Ariba represented that each issue would be addressed so long as KEI continued to work with SAP Ariba's recommended integration partner,

Intrigo (to whom KEI wound up paying roughly a half-million dollars), to create "workarounds." SAP Ariba's assurances continued as late as a December 7, 2018 meeting at KEI.

38. KEI reasonably relied on the assurances SAP Ariba made throughout 2018. SAP Ariba had far greater knowledge and experience regarding its software services, and specifically what was and was not possible with respect to the services it purportedly sold to KEI.

39. In the weeks after that December 7, 2018 meeting, KEI considered whether it should continue working with SAP Ariba. By the end of December 2018, KEI determined that doing so would be fruitless. The "services" SAP Ariba claimed to be providing KEI would not be able to eliminate KEI's reliance on Quote Win and Fusion Ops. They would not enhance KEI's capabilities supply chain management process in ways that led to greater efficiencies. And they would provide no functionality at all absent any number of "workarounds" (if the "workarounds" even worked).

40. Indeed, SAP Ariba's proposed "workarounds" likely would have required KEI to hire additional personnel and increase the number of steps necessary to procure and manage the supply of parts. In sum, had KEI attempted to "go live" with SAP Ariba, KEI's supply chain management likely would have been thrown into disarray.

41. On January 4, 2019, KEI notified SAP Ariba that, effective immediately, it was terminating Order Form-350. A true and correct copy of that January 4, 2019 letter is attached as **Exhibit 2**.

42. On January 10, 2019, SAP Ariba responded to KEI's termination by stating that SAP Ariba "reject[ed] the assertion that Kimball has any rights to under the agreement to terminate." A true and correct copy of SAP Ariba's January 10, 2019 letter is attached as **Exhibit 3**.

43. As set forth in its Complaint, plaintiff SG Equipment Finance USA Corp. ("SGEF") claims that SAP Ariba assigned to SGEF the right to payments allegedly due from KEI.

44. If KEI and SAP Ariba did not have an enforceable agreement, because there was no meeting of the minds between them, then SAP Ariba would have had no rights to assign to anyone—including SGEF.

45. If KEI and SAP Ariba did not have an enforceable agreement, because SAP Ariba fraudulently induced KEI to enter into a contract, then SAP Ariba would have no rights to assign to anyone—including SGEF.

46. If KEI and SAP Ariba had an enforceable agreement, KEI's payment obligations under that agreement never would have arisen due to SAP Ariba's failure to perform.

47. If KEI and SAP Ariba had an enforceable agreement requiring payment from KEI, that agreement would have been governed by the General Terms and Conditions. Paragraph 12.6 of the General Terms and Conditions would have restricted SAP Ariba's ability to assign its rights under any agreement with KEI—specifically, SAP Ariba could not assign its rights to anyone other than "SAP SE or any of its Affiliates."

48. "Affiliate" is a defined term in the General Terms and Conditions: "any legal entity in which a party [SAP Ariba or KEI], directly or indirectly, holds more than fifty percent (50%) of the entity's shares or voting rights. Any legal entity will be considered an Affiliate as long as that interest is maintained."

49. SGEF is not an "Affiliate" of SAP SE, as that term is defined by the General Terms and Conditions.

50. If KEI and SAP Ariba had an enforceable agreement, that agreement validly was terminated on January 4, 2019.

51. As set forth in its Complaint, SGEF asserts a right to payment pursuant to a document purporting to amend Order Form 0220192499 ("Order Form-499"). KEI has no record of the existence of any Order Form-499 between KEI and SAP Ariba. If such an order form did exist, any claim for payment based upon it would fail for the same reasons as any such claim premised on Order Form-350.

52. If, despite the allegations set forth in the foregoing paragraphs, a court were to determine that KEI were liable to SGEF despite SAP Ariba's conduct, then SAP Ariba would be liable to KEI for any amount due to SGEF.

## COUNT I – DECLARATORY JUDGMENT

53. KEI incorporates by reference the allegations set forth in Paragraphs 1-52.

54. An actual controversy exists between the parties with respect to whether any alleged agreement between KEI and SAP Ariba was sufficiently definite to be enforceable.

55. An actual controversy exists between the parties with respect to whether any alleged agreement between KEI and SAP Ariba was void because it was procured by SAP Ariba's fraudulent representations and material omissions of fact.

56. An actual controversy exists as to whether SAP Ariba possessed or possesses any right to payment from KEI that it validly could assign to SGEF.

57. If KEI and SAP Ariba did have an enforceable agreement, an actual controversy exists between the parties with respect to whether KEI's January 4, 2019 termination was effective.

58. If KEI and SAP Ariba did have an enforceable agreement, and if SAP Ariba validly could assign any payment right to SGEF, an actual controversy exists between the parties with respect to any amount owed to SGEF.

59. An actual controversy exists between the parties with respect to whether there actually was any Order Form-499, pursuant to which KEI might owe any payment or, alternatively, whether any claim for payment premised on Order Form-499 fails for the same reasons as any such claim premised on Order Form-350.

60. A declaratory judgment by this Court will resolve an actual dispute between the parties.

## COUNT II – FRAUD

61. KEI incorporates by reference the allegations set forth in Paragraphs 1-52.

62. If KEI and SAP Ariba entered into a contract, KEI was induced to do so as a result of SAP's fraudulent representations and material omissions of fact, set forth above, regarding the functionality of its services and the use of SAP Ariba's system by KEI parts manufacturers, including Texas Instruments.

63. SAP Ariba had a duty to deal openly and honestly with its customer, KEI.

64. KEI reasonably relied on SAP Ariba's false representations and material omissions of fact.

65. KEI has been, or may be, harmed by SAP Ariba's false representations and material omissions of fact, should KEI be liable for any payment to SGEF resulting from the fraudulently induced transaction.

## COUNT III – BREACH OF CONTRACT

66. KEI incorporates by reference the allegations set forth in Paragraphs 1-52.

67. If KEI and SAP Ariba entered into any contract, then SAP Ariba breached that contract by: (a) failing to provide any of the services contemplated by the contract; (b) failing to comply with its warranties in the contract; and (c) purporting to assign its contract rights to SGEF, when such an assignment was prohibited by the contract.

68. KEI has been, or may be, harmed by SAP Ariba's breaches, should KEI be determined liable for any payment to SGEF resulting from the breached contract.

## PRAYER FOR RELIEF

WHEREFORE, KEI, by counsel, respectfully requests that this Court enter a judgment:

1. Declaring that:

    a. KEI and SAP Ariba had no enforceable agreement, rendering any purported assignment by SAP Ariba to SGEF a nullity;

    b. Any purported assignment by SAP Ariba to SGEF is invalid, because SAP SE does not own more than 50 percent of SGEF's shares or voting rights;

    c. SAP Ariba has not possessed, and does not possess today, any right to payment from KEI that it validly could assign to SGEF;

    d. If KEI and SAP Ariba did have an enforceable agreement, KEI's January 4, 2019 termination was effective; and/or

e. There was no Order Form-499, pursuant to which KEI might owe a any payment or, alternatively, any claim for payment based upon such order form fails for the same reasons as any such claim premised on Order Form-350.

2. Awarding KEI damages in an amount sufficient to pay, in full, any damages awarded to SGEF and against KEI in this action.

3. Awarding KEI any other appropriate compensatory or exemplary damages, according to the proof at trial.

4. Awarding KEI its costs and fees incurred in this action.

## DEMAND FOR JURY TRIAL

KEI hereby demands a trial by jury, as to all issues so triable.

Respectfully submitted,

Date: November 26, 2019

s/ *Michael R. Limrick*
Andrew W. Hull (11218-49)
awhull@hooverhullturner.com
Michael R. Limrick (23047-49)
mlimrick@hooverhullturner.com
HOOVER HULL TURNER LLP
111 Monument Circle, Suite 4400
P.O. Box 44989
Indianapolis, IN 46244-0989
Tel: (317) 822-4400
Fax: (317) 822-0234

**CERTIFICATE OF SERVICE**

The undersigned counsel certifies that a copy of the forgoing has been served on this 26th day of November, 2019, upon all counsel of record via the court's CM/ECF system.

*s/ Michael R. Limrick*
Attorney for Defendant